UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X
KIM CLARK,

                                            Plaintiff,                    **VERIFIED**
                                                                         **COMPLAINT**
          -against -                                                     *Jury Trial Demanded*

LONG ISLAND UNIVERSITY and,
DR. KIMBERLY R. CLINE, Individually and in her
Official Capacity,

                                            Defendants.
------------------------------------------------------------------------------X

      Plaintiff, KIM CLARKE, by and through her attorneys, NESENOFF & MILTENBERG,

LLP., whose offices are located at 363 Seventh Avenue – Fifth Floor, New York, New York

10001, respectfully alleges, upon knowledge as to herself and her own actions, and upon

information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

      1.    This is a civil action brought on behalf of Plaintiff Kim Clark (hereinafter,

"Plaintiff" or "Ms. Clark") against Defendant Long Island University (hereinafter, "LIU" or

"Defendant LIU") and Defendant Dr. Kimberly R. Cline ("Defendant Cline") for discrimination

and retaliation in violation of: (i) the New York State Human Rights Law; (ii) 42 U.S.C. § 1981;

and (iii) the New York City Human Rights Law.  Defendant LIU, one of the nation's largest

private Universities with campuses throughout Long Island, New York, purports to pride itself

on meeting the educational and professional needs of its diverse student body.  Unfortunately,

Defendant LIU does not see it necessary to similarly serve its dedicated employees and faculty,

who are subjected to daily harassment, arbitrary and discriminatory demotions and terminations,

and a hostile work environment.  Rather, spearheaded by its President, Defendant Cline, LIU has

repeatedly chosen to systematically target its most distinguished personnel in favor of promoting a less diverse and, ultimately less qualified, public image.

2.     Briefly, Ms. Clark commenced employment with Defendant LIU in or around 2002 as the Director of Institutional Advancement at Defendant's Brooklyn, New York campus. Ms. Clark, an accomplished and notable attorney, made great strides while employed at LIU and was at one time revered for her dedication to LIU and LIU's students.  All of that admiration for Plaintiff changed in 2013, however, when LIU appointed Defendant Cline as LIU's new President. Under Defendant Cline's reign, LIU systematically purged its campuses of LIU's older and minority faculty members, and placed its minority students on the back burner while promoting its Caucasian student body in public advertisements.  Unfortunately for Plaintiff, Ms. Clark became yet another victim to LIU's new discriminatory business scheme as she was, among other things: (i) subjected to condescending and demeaning remarks about her life accomplishments; (ii) repeatedly demoted in favor of a younger, Caucasian male employee; (iii) forced to work in a deplorable and medically dangerous environment; and eventually (iv) constructively discharged.

## JURISDICTION AND VENUE

3.     This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because Plaintiff is a resident and domiciliary of the State of New Jersey and Defendant's principal place of business is located in the State of New York.  Further, Plaintiff has been damaged in an amount to be determined at trial but in no case less than $75,000.00, exclusive of attorneys' fees, costs, and expenses.  Moreover, this court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

4.     Venue is proper pursuant to 28 U.S.C. § 1391 because (1) a substantial part of the

events which give rise to the Plaintiff's claims took place in Kings County, New York which is located in the Eastern District of New York and (2) Defendant is located in Kings County, New York which is in the Eastern District of New York.

## PARTIES

5.    Plaintiff Kim Clark is a forty-six (46) year old African-American female who is a resident and domiciliary of Essex County, New Jersey.

6.    At all times relevant, Plaintiff worked for Defendant LIU in Brooklyn, New York.

7.    At all times relevant, Plaintiff was an "employee" of Defendant LIU as that term is defined by all applicable Federal, State, and local laws, including but not limited to the New York State Human Rights Law (N.Y. Exec. Law §§ 290 *et. seq.*) and the New York City Human Rights Law.

8.    Upon information and belief, Defendant LIU is a privately owned institution for higher education, with a campus located in Brooklyn, New York and its principal place of business located at 700 Northern Boulevard, Brookville, New York 11548.

9.    At all times relevant, Defendant LIU was Plaintiff's "employer" as that term is defined by all applicable Federal, State, and local laws, including but not limited to the New York State Human Rights Law and the New York City Human Rights Law.

10.    Upon information and belief, Defendant Cline, at all times relevant, is and was the President of Defendant LIU and Plaintiff's supervisor and "employer" as that term is defined by all applicable Federal, State, and local laws, including but not limited to the New York State Human Rights Law and the New York City Human Rights Law.

11.    As discussed in detail below, the individually named Defendant endorsed, directly participated in, aided, and abetted the discriminatory and retaliatory conduct perpetrated against

Plaintiff.

## FACTUAL ALLEGATIONS

### Background

12.     Ms. Clark commenced employment with Defendant LIU in or around 2002 as the Director of Institutional Advancement at Defendant LIU's Brooklyn, New York campus located at 1 University Plaza, Brooklyn, New York 11201.

13.     In or around 2006, Ms. Clark voluntarily resigned as the Director of Institutional Advancement and Director of Paralegal Studies at Defendant LIU but remained employed with Defendant LIU as a special advisor to the office of the provost.  While employed as a special advisor, Ms. Clark commenced employment at Georgetown University where she continued her altruistic and inspiring work.

14.     Ms. Clark's full-time presence was not absent from Defendant LIU for too long, as she returned in approximately 2007 as Defendant LIU's Dean of Institutional Advancement. Her great workmanship soon led to a further promotion to Dean of Student Affairs *and* Dean of Institutional Advancement.  Upon information and belief, Ms. Clark was the *only* administrator who fulfilled two deanship positions in the above capacities in Defendant LIU's history.

15.     Ms. Clark was trusted to work closely with both students, administrators and all staff at Defendant LIU.

16.     In or around early 2013, Dr. David Steinberg retired and stepped down as the President of Defendant LIU. In his stead, Defendant LIU hired Defendant Cline, who remains as Defendant LIU's current President.

17.     At all times relevant, Defendant Cline was Plaintiff's executive supervisor and, at some points, directly supervised Plaintiff and/or directed the operation of Plaintiff's offices.

18.     Ms. Clark looked forward to working with Defendant Cline and continuing her work at Defendant LIU in her dual role as Dean of Student Affairs and Dean of Institutional Advancement.

**Defendant Cline Patronizes Plaintiff and**
**Undermines Ms. Clark's Impressive Accomplishments**

19.     Upon her hiring, Defendant Cline brought in several new administrators including Vice President Jackie Nealon ("VP Nealon").   Upon information and belief, VP Nealon is Caucasian.

20.     Ms. Clark met with VP Nealon at the Provost's Office at LIU's Brooklyn, New York campus.  During the meeting, VP Nealon sat across from Plaintiff, stared Ms. Clark down, and condescendingly asked Plaintiff: "What do you want to be when you grow up?"

21.     Taken aback by VP Nealon's tone and comment, Ms. Clark politely informed VP Nealon that she was, in fact, a highly-accomplished attorney who had been a senior administrator for nearly twelve (12) years, and had numerous accolades and commendations to her name.

22.     Despite Plaintiff's impressive resume and work history, VP Nealon remained flippant and disinterested in Plaintiff's accomplishments.   Upon information and belief, VP Nealon refused to acknowledge that Plaintiff, an African-American woman, had accomplished so much in so short a time span because of Ms. Clark's race.

23.     Thereafter, Defendant Cline continued to undermine Plaintiff's lifework. Specifically, Plaintiff met with Defendant Cline, VP Nealon, and LIU's Provost, Gale Stevens Haynes ("Provost Haynes") to go over any and all updates to the departmental activities at Defendant LIU.  At the meeting, Plaintiff prepared and presented a comprehensive update of all departmental activities, and distributed copies of relevant strategy plans and assessments.

24.     Despite Plaintiff's impressive showing, Defendant Cline was entirely dismissive

and instead took the opportunity to mock Plaintiff. Defendant Cline patronized Plaintiff that she had talked to staff at Defendant LIU and it was "like [she] walk[ed] on water" and stated to Plaintiff: "Oh, you're moot court – I get that!"

25. As an attorney, Plaintiff understood that Defendant Cline was making fun of her experience practicing law and intimating that she was not yet a real attorney but rather like a naïve law student just starting out. Once again, Defendants refused to acknowledge Plaintiff's personal and professional accomplishments on the basis of her race.

**Defendant LIU Goes Behind Plaintiff's Back and**
**Appoints a New Caucasian Male Dean to Replace Her**

26. In or around 2013, shortly after the aforementioned meeting with Defendant Cline, Defendants abruptly and without justification replaced Ms. Clark. Defendant Cline indicated that she wanted a more "traditional" Dean and quickly replaced Ms. Clark with a male Caucasian employee.

27. Specifically, one day, a then unknown Caucasian man entered Ms. Clark's office accompanied by a representative from Defendant LIU's Human Resources ("HR") department, and introduced himself to Plaintiff's secretary. The unknown man later revealed himself to the staff as John Agnelli ("Mr. Agnelli"). Mr. Agnelli did not interact with Plaintiff during his unscheduled visit, despite the fact that he could clearly see her in her office.

28. Shortly thereafter, Plaintiff learned that Mr. Agnelli had been appointed as Defendant LIU's new Dean of Student Affairs. Ms. Clark learned of this through students who had been introduced to Mr. Agnelli in his capacity as the new Dean of Students and who did not understand why she had been removed as Dean of Student Affairs. At that time, Ms. Clark did not even know that she *had* been replaced as Dean of Student Affairs, as no one at Defendant LIU granted her the courtesy of notifying her as to Mr. Agnelli's appointment.

29. In addition, unbeknownst to Plaintiff, Mr. Agnelli also received Ms. Clark's reserved parking space. Plaintiff learned of this re-assignment when she returned to work and was advised by public safety that Defendants has re-assigned her parking space to Mr. Agnelli. Ms. Clark was directed to park off campus. It appeared as though nearly everyone was officially aware of Ms. Clark's replacement, except Ms. Clark.

30. Upon information and belief, Mr. Agnelli had already moved into his new housing at Defendant LIU, in the new, multi-million dollar, state of the art residential housing facility located off campus in the vibrant downtown Brooklyn community. Notably, Defendants never afforded Ms. Clark this housing opportunity during her tenure as Dean of Student Affairs, despite having helped to develop the graduate housing facility.

**Mr. Agnelli Refers to Plaintiff**
**By Discriminatory and Degrading Nicknames**

31. Mr. Agnelli repeatedly and publicly referred to Plaintiff by racially charged nicknames. Specifically, Mr. Agnelli called Plaintiff "sista" and "sister" in front of Defendant LIU's students as a clear derogatory comment based upon Plaintiff's race.

32. Plaintiff was appalled by Mr. Agnelli's discriminatory name calling and repeatedly told him to stop using such names and simply call her "Kim." Mr. Agnelli refused to stop.

33. Ms. Clark told HR about such comments but still, Mr. Agnelli continued. Clearly, Defendants turned a blind eye to Mr. Agnelli's bias behavior and permitted Plaintiff to be ridiculed daily on the basis of her race.

**LIU Demotes Plaintiff**

34. In or around September 2013, Provost Haynes contacted Ms. Clark at her office during her lunch hour, and asked Plaintiff to meet with her immediately. Provost Haynes

indicated the matter was urgent.

35.     Ms. Clark immediately met with Provost Haynes and was appalled to learn that Defendant LIU, at the direction and behest of Defendant Cline, was implementing several changes that specifically adversely affected Plaintiff's role and position at Defendant LIU.

36.     Although Provost Haynes tried to assure Plaintiff that they would still work together, it was clear to Ms. Clark that she was being phased out in favor of Mr. Agnelli, a Caucasian male.

37.     Ms. Clark immediately became distraught at the thought of all her hard work being disregarded, and broke down in tears before Provost Haynes.  At such time, Ms. Clark was officially notified that she was being demoted to a Director position.  Notably, Ms. Clark, the *only* African-American Dean, was the *only* dean at Defendant LIU who was demoted to a Director position.

38.     Ms. Clark informed Provost Haynes that she would not accept the director title, as it represented an obvious and unwarranted demotion.  In response, Provost Haynes told Plaintiff that she would speak to Defendant Cline.

39.     Thereafter, Provost Haynes phoned Ms. Clark in her office and, in an attempt to cover Defendant Cline's tracks, offered to keep Plaintiff's title as Dean of Institutional Advancement, a role and position she held prior to being Dean of Student Affairs.

40.     Defendants assured Ms. Clark that the transition would happen gradually and expected Ms. Clark to continue on in her dual capacity until Defendant LIU officially notified the students of the change in her role.  Upon information and belief, Defendant LIU's students were extremely dismayed and upset to hear of Ms. Clark's demotion.  True to form, however, Defendants did not care about the students' opinions, even when Defendants' actions clearly

ostracized and negatively affected the student body.

41. By way of example, as one of Ms. Clark's last acts as Dean of Student Affairs, Plaintiff hosted a campus-wide "Celebration of Life" for an African-American student leader who had passed away tragically on campus. When Plaintiff disseminated information about the event, Defendants strongly advised her to remove the photo of the African-American student and the life of the student was further minimized with shanty remarks.

42. Clearly, Defendants did not give any care to the opinions, reputations, or well-being of Defendant LIU's minority students.

**Plaintiff is Kicked Out of Her Office in a State of Embarrassment**

43. Based upon Defendants' assurances, Ms. Clark continued in her capacity as both Dean of Student Affairs and Dean of Institutional Advancement, and prepared herself and her students for her eventual demotion.

44. Defendants did not afford Ms. Clark much time to adjust to her new position, however. Indeed, despite Defendant LIU's assurances, Defendants immediately demanded Plaintiff vacate her current office to be replaced by Mr. Agnelli.

45. Indeed, shortly after her meeting with Provost Haynes and discussion thereafter, Plaintiff was notified by phone to vacate her office immediately, with the expectation that she would relocate her entire office by the end of the day. Upon information and belief, Defendant Cline directed that Plaintiff vacate immediately, as she was excited and eager to replace Ms. Clark with the new, male, Caucasian Dean.

46. Plaintiff was forced to pack up her office of twelve years in a state of turmoil and embarrassment. Later that day, Defendant LIU's maintenance employees came to Plaintiff's office, removed all of her belongings, and showed Plaintiff to her new office in the Office of

Public Relations where she was left to work alone.   Defendant LIU even went so far as to preclude Ms. Clark from having a secretary or any office support, which increased Ms. Clark's workload exponentially.

**LIU Demotes Plaintiff…Again**

47.     After Defendants abruptly uprooted Plaintiff from her long-time office space, Defendant LIU delivered yet another blow to Plaintiff, and informed her of yet another demotion.

48.     After Ms. Clark settled into her new office space, Defendants notified her that she was not going to be the Dean of Institutional Advancement anymore.   Rather, Ms. Clark was again demoted – this time to an Executive Director of Development position.   Upon information and belief, this demotion was determined and demanded by Defendant Cline.

49.     In her new role, Plaintiff was supervised by Drew Kaiden ("Mr. Kaiden").   Upon information and belief, Mr. Kaiden is Caucasian.

50.     Adding insult to injury, Mr. Agnelli began to call Plaintiff "boss," clearly mocking her loss of status and ranking at Defendant LIU following her unwarranted and repeated demotions.

51.     Once again, Ms. Clark adamantly opposed Mr. Agnelli's name calling and repeatedly told Ms. Agnelli to call her "Kim."   Plaintiff's protests were all for naught, as Mr. Agnelli continued to call Ms. Clark "boss" and "boss lady."

52.     Despite his bravado, Mr. Agnelli proved utterly oblivious in his new role.   In fact, Mr. Agnelli often times turned to Plaintiff for guidance and updates about the student affairs role, despite the fact that such duties had been discriminatorily stripped away from Ms. Clark.

**Mr. Kaiden Exerts His Authority Over Plaintiff**
**And Repeatedly Threatens Plaintiff's Employment at LIU**

53.     Upon information and belief, Mr. Kaiden held a deep-rooted animus against African-American employees and had been the subject of several complaints of discrimination from former African-American employees at LIU.   While working under Mr. Kaiden's supervision, Plaintiff experienced untold harassment and hostility predicated upon her race.

54.     Mr. Kaiden informed Plaintiff that in her new capacity she: (i) would not have any supervisory authority or duties; (ii) would not have any staff members working for, under, or with her; and (iii) would be responsible predominantly for drafting Mr. Kaiden's correspondence.   Essentially, Plaintiff was stripped of all of her high ranking, supervisory duties at Defendant LIU and instead was assigned menial secretarial work.   All of Ms. Clark's previous staff members were re-assigned to work with Mr. Agnelli.

55.     Ms. Clark was directed not to communicate with any Defendant LIU leadership or administrator personnel, despite serving as a twelve-year executive who was often responsible for hosting trainings, assessment groups, and leadership events at the direction of the Provost. Indeed, Mr. Kaiden chastised Ms. Clark upon her return from any mandated assignments which were specifically requested by Provost Haynes and/or V.P. Jackie Nealon.

56.     Mr. Kaiden used every opportunity he had to belittle and demean Plaintiff and remind her that she no longer held the high-ranking position she once did at Defendant LIU.

57.     Mr. Kaiden also prohibited Ms. Clark from attending any and all external or extracurricular events at Defendant LIU and explicitly warned against interacting with the Defendant LIU and greater Brooklyn community even though Ms. Clark had previously co-chaired Defendants' External Relations Council and was amongst the lead contact for all external legislators and community stakeholders.

58.     Ms. Clark was even directed that all correspondence no matter how small was to

be reviewed by Mr. Kaiden. Essentially, Mr. Kaiden forced Plaintiff into isolation to suffer in silence under his supervision.

59.     Mr. Kaiden made it abundantly clear that if Ms. Clark ever broke one of his discriminatory rules, he could and would terminate her employment for alleged insubordination, with Defendants' full support.

60.     Mr. Kaiden also made it a habit to make derogatory and demeaning comments regarding Ms. Clark's fellow African-American colleagues. Specifically, Mr. Kaiden gloated that one distinguished African-American man was going to be removed as a Board member and inferred that another was a liar and lacked the professional contacts with the ability to make major gifts to Defendant LIU.

**Plaintiff is Forced to Work in Deplorable Conditions**
**Causing Severely Negative Effects on Her Health**

61.     In or around October 2013, Plaintiff was again forced to move offices to a space located in the HS 114 building (the "HS 114 Office"). Upon information and belief, Plaintiff's new office was known to Defendants to be in deplorable condition and was not a safe working environment due to the infestation of mold in/on the walls. Despite knowing that the HS 114 Office was unsafe and unfit to work in, Defendant LIU forced Plaintiff to relocate there. Upon information and belief, Defendant Cline demanded Plaintiff transfer to that specific office space.

62.     Under threat of disciplinary action, Ms. Clark relocated to the HS 114 Office. The HS 114 Office was in horrendous condition. Not only was the office mold ridden, it was extremely cramped with no windows and no sufficient method of ventilation. The only ventilation the HS 114 Office had was one full ceiling vent which blasted air directly on top of Plaintiff, and which had significant negative effects on Plaintiff's health.

63.     Moreover, during the winter months, Defendant LIU did not provide the HS 114

Office with heat, which forced Ms. Clark to wear coats and hats, and use personal portable heaters to remain warm.

64.     Despite reports that the HS 114 Office was in poor condition, including one report by Defendant LIU which tested positive for mold, Defendants forced Ms. Clark to remain in the HS 114 Office.  In fact, instead of fixing or addressing the deplorable conditions in the HS 114 Office, Defendant LIU chose instead to try and hide them, and painted over the mold in lieu of treating it.

65.     Upon information and belief, as a result of inhaling mold on a daily basis, the lack of proper ventilation or clean air, and the lack of regular heat, Ms. Clark frequently fell ill. Plaintiff suffered from laryngitis, constant cold symptoms, and a weakened immune system.  Ms. Clark even suffered life threatening blood clots as a consequence of her work environment.

66.     Defendants, at all times, knew of the poor conditions inside the HS 114 Office. Indeed, in or about September 2014, Ms. Clark was informed by Defendant LIU's Buildings and Grounds Department that Defendant LIU was aware of the mold because it was so severe that it could be seen in the areas below the HS 114 Office and covered all of the walls in the HS 114 Office.

**Plaintiff Complains to Defendant LIU's HR Department**

67.     Unable to withstand her caustic work environment, Ms. Clark contacted Defendant LIU's HR Department within two (2) weeks of her second demotion, and scheduled a meeting with Raquel Collado ("Ms. Collado").

68.     Ms. Clark met with Ms. Collado to discuss the horrible state of her work environment.  At such time, in tears, Ms. Clark lodged a formal complaint of discrimination and harassment.

69.     Specifically, Ms. Clark informed Ms. Collado that, among other things, Mr. Kaiden: (i) stripped Plaintiff of all of her duties and responsibilities; (ii) criticized Ms. Clark that she could not write simple letters; (iii) prohibited Plaintiff from contacting or corresponding with senior administration and, in the event she *had* to speak to a senior administrator, demanded that Plaintiff include him on every email; (iv) prohibited Plaintiff from joining any committees; and (v) precluded Ms. Clark from campus events, with the exception of staff meetings.

70.     Ms. Clark further complained about the condition of the HS 114 Office. Specifically, Ms. Clark informed Ms. Collado that the office space lacked proper ventilation and was infested with mold on the walls and ceiling.

71.     Ms. Collado acknowledged that Mr. Kaiden had previously been accused of racial discrimination by a former African American Alumni Director but that HR had not taken any action in response to the previous complaint(s). Likewise, Defendant LIU refused to investigate or act upon Plaintiff's complaint, and forced Plaintiff to continue suffering under Mr. Kaiden's discriminatory supervision.

72.     Moreover, Defendant LIU continued to ignore the blatant hazard the HS 114 Office posed. Ms. Clark offered to pay for a mold test and provided the name of a company to perform the test but Defendants denied this request.

**Plaintiff Goes Out on Disability Leave and**
**Returns to Increasing Hostility and Harassment**

73.     As a result of the deplorable working conditions in the HS 114 Office and the attendant negative effects that environment had on Ms. Clark's health, Plaintiff went out on a disability leave for a period of approximately three months beginning in June 2014.

74.     Plaintiff returned from disability leave on or about September 2014.  At such time, her new direct supervisor was Michael Glickman ("Mr. Glickman"), who, upon

information and belief, was Caucasian and is younger than Plaintiff.

75.     Mr. Kaiden informed Ms. Clark that the university hired Mr. Glickman as the Chair of Development.   Mr. Kaiden further informed Ms. Clark that he had met with Mr. Glickman and that they were "lock and step."   Plaintiff understood this to mean that Mr. Glickman shared Mr. Kaiden's discriminatory beliefs and her optimistic hope of a reprieve from Mr. Kaiden was quickly dispelled.

76.     Mr. Glickman picked up right where Mr. Kaiden left off prior to Ms. William's disability leave, and subjected Ms. Clark to increased discrimination and harassment on the basis of her race, disability, and age.

77.     Mr. Glickman increasingly isolated Ms. Clark from office functions and events, which had a severely negative impact on her ability to perform her job duties.  For example, Mr. Glickman purposefully failed to inform Ms. Clark of Defendant LIU's fundraisers. When Mr. Glickman did tell Plaintiff about Defendant LIU's fundraisers and did include her in fundraising events, Mr. Glickman purposefully assigned Plaintiff insurmountable goals in an effort to make her fail.

78.     Specifically, Plaintiff was Defendant LIU's Executive Director of Major Gifts and was tasked with raising money and gifts for Defendant LIU's fundraisers.  Initially, Defendants required Plaintiff to collect major gifts, which were contributions of at least $1,000.00 per donor. As if this mandate was not exorbitant enough, within one week, Mr. Glickman informed Ms. Clark that for her, and only her, a major gift was one worth at least $20,000.00 per donor.

79.     Upon information and belief, Mr. Glickman was fully aware that any donors with the potential to donate $20,000.00 or more were reserved for himself and Defendant Cline to contact.  Further, upon information and belief, this was the highest requirement set for any LIU

staff member.

80.     Making matters worse, the majority of Ms. Clark's major gift donors where persons with largely no history of giving - even at minimal levels of just $100.00. In short, they were not "major donors" or persons with the capacity to give at the level Mr. Glickman required of Plaintiff, and only Plaintiff.

81.     Despite this obstacle, Ms. Clark dutifully called every single donor on her list, in addition to contacting other third parties not included on her donor list, in a faithful attempt to meet her fundraising requirement. Ms. Clark was successful in obtaining many first-time donors.

82.     While Plaintiff worked frantically to raise the required funds, Mr. Glickman took every opportunity to sabotage her work and demean Plaintiff to her co-workers. For instance, after learning that Ms. Clark had success in generating major gifts from recent alumni who visited the office, Mr. Glickman immediately forbade Plaintiff from speaking to any alumni who entered the office.

83.     Mr. Glickman further called Ms. Clark's new major donors and directed them to contact him directly, to ensure Plaintiff would no longer have success fundraising.

84.     Further, Mr. Glickman asked staff members "do you know any good fundraisers?" within earshot of Plaintiff; frequently yelled at Plaintiff: "to be a fundraiser, you have to actually fund-raise!"; and wrongfully accused Plaintiff of "not raising a single gift."

85.     Mr. Glickman's antics were entirely uncalled for and completely unjustified. Upon information and belief, Plaintiff not only met her required minimum goal but far exceeded it during the 2013/2014 academic year - as she had in previous years.

86.     Adding insult to injury, Defendant LIU again went over Ms. Clark's head and hired a new Major Gifts officer without her knowledge, and without receiving any input from

Ms. Clark. Defendants also found new ways to accredit Plaintiff's contribution to Defendant LIU to Mr. Agnelli. By way of example, in her capacity as Dean of Institutional Advancement, Ms. Clark raised millions of dollars to support Defendant LIU. The credit for the recurring and new gifts generated by Ms. Clark were assigned to Mr. Agnelli and, various other Defendant LIU officials, at the behest of Defendant Cline.

87.   Mr. Glickman, with Defendants' support, further tried to hide Ms. Clark from Defendant LIU and the community, and adamantly refused to add her name to Defendant LIU's Alumni Affairs website despite listing all other staff members.

88.   Mr. Glickman further refused to invite Plaintiff to any office meetings or trainings, and explicitly precluded her from Defendant LIU's campus meetings. He further isolated Ms. Clark by refusing to eat lunches with her, unlike other staff members whom he routinely took out.

89.   Lastly, Mr. Glickman micro-managed Plaintiff and, upon information and belief, directed secretaries assigned from Defendant LIU's Library to report Ms. Clark's arrival and daily activities to him. Defendant Cline joined in this scrutiny and often hid behind Ms. Clark's office in a cubical space - where she was within earshot of Ms. Clark's discussions with donors – to secretly keep track of Ms. Clark throughout the day.

90.   Mr. Glickman further micromanaged Plaintiff's every move and tracked her daily attendance by requiring Plaintiff to submit a timesheet to the Director of Alumni Affairs. Notably, the Director of Alumni Affairs was a subordinate position to Plaintiff's. At other times, Mr. Glickman refused to sign Plaintiff's timesheet all together, causing Ms. Clark to notify the Provost and Defendant Cline in an effort to obtain a payroll signature.

91.   Defendant Cline and Mr. Glickman set the tone for the entire office and soon Ms.

Clark's colleagues similarly shunned her.  By way of example, Plaintiff's colleagues refused to introduce her to the office's new student workers.

**Defendant Systematically Targets**
**Older and Minority Teachers**

92.     Defendants' conduct towards Plaintiff, while deplorable, was not surprising in light of Defendants' documented history of discriminating against older and minority staff members.

93.     Specifically, Defendants have systematically purged Defendant LIU's campuses of older and minority teachers and staff, and replaced them with new younger and predominantly Caucasian employees.

94.     For example, upon information and belief, since September 2016, Defendant LIU has unjustifiably terminated or otherwise temporarily pushed out of employment nearly 200 African-American and older Caucasian faculty employees due to their objection to being discriminated against by specifically receiving 20% less salary than their similarly-situated and less diverse and younger counterparts at Defendant LIU's CW Post campus, known colloquially as the "white campus."

95.     Upon information and belief, the faculty salaries and health insurance was immediately cancelled, email accounts were shut down, and distinguished faculty were further prohibited from entering the LIU-Brooklyn Campus.  Upon information and belief, the above faculty were immediately replaced by nearly 140 workers, the majority of which were Caucasian and younger workers.

96.     By further example, upon information and belief, Defendant LIU has unjustifiably terminated or otherwise pushed out of employment, the following African-American and other minority employees since 2013,

- A. S., Defendant LIU's former Dean of Admissions;
- L. D., Defendant LIU's former Director of School of Business;
- A. B., Defendant LIU's former Student Activities Coordinator;
- O. R., Defendant LIU's former School of Pharmacy Coordinator;
- L. S., Defendant LIU's former Student Affairs Coordinator;
- A. G., Defendant LIU's former Public Relations Officer;
- N. F., Defendant LIU's former Student Affairs Coordinator;
- V. S., Defendant LIU's former Student Affairs Director
- S. S.; Defendant LIU's former Residence Life & Housing Associate Director;
- J. M., Defendant LIU's former Public Safety Captain;
- J. R., Defendant LIU's former Public Safety, Captain; and
- S. L., Defendant LIU's former Public Safety, Lieutenant.

97.     Upon information and belief, the above employees were all replaced by Caucasian workers.

98.     Furthermore, Defendants have systematically eliminated older faculty and staff members in favor of hiring younger employees whom, upon information and belief, are all younger than 35 years of age.

99.     Upon information and belief, Defendant LIU has unjustifiably demoted, terminated, or otherwise pushed out of employment the following employees over the age of fifty (50) since 2013:

- H. G., Defendant LIU's former Special Events/Human Resources Officer;
- H. S., Defendant LIU's former Public Relations Officer;
- C. W., Defendant LIU's former Government Relations Director;
- K. R., Defendant LIU's former Sponsored Research Director;
- D. V., Defendant LIU's former HEOP, Director;
- C. G., Defendant LIU's former Honors, Director; and
- S. S., Defendant LIU's former Career Services/Student Affairs, Director.

100.     Upon information and belief, the above employees were all replaced by workers between the ages of twenty (20) to thirty-five (35).

101.     Upon information and belief, Defendant LIU has also unjustifiably targeted African Americans in executive roles as a vast number of African American supervisors and executives have been pushed out of employment or terminated from their roles at Defendant

LIU. These distinguished employees, upon information and belief, have been replaced by less-qualified and younger Caucasian individuals.

**Plaintiff Becomes Another Casualty In Defendants' Scheme**

102. As a result of the near constant harassment, discrimination, and retaliation, Defendants succeeded in eliminating Ms. Clark from Defendant LIU permanently.

103. In or around October 2014, Plaintiff could no longer withstand the constant barrage of threats, derogatory comments, harassing and bullying behavior, and unequal treatment she faced at the hands of her employer and her direct supervisors.

104. Accordingly, Plaintiff pleaded with Defendant LIU's HR Department one last time for help but was once again met with utter disinterest. The only help Defendant LIU's HR representative offered Plaintiff was to hand her a confidential employment announcement within the Downtown Community. Essentially, Defendant LIU told Plaintiff to deal with the daily discrimination or leave.

105. As a result, amidst threats, intimidation, declining health due to work conditions and discrimination, Plaintiff was forced to resign from her once loved employment at Defendant LIU on October 31, 2014. Notably, upon information and belief, Defendant LIU had afforded Plaintiff's previous Caucasian colleagues, notably Mr. Agnelli, generous severance packages upon their resignation, despite having only been employed with Defendant for a brief time. Despite the horrors Defendant LIU had subjected Plaintiff to, Defendants refused to show Plaintiff any amount of courtesy and made Ms. Clark no severance offers.

106. Thereafter, as though the torment while she was employed was not enough, Defendants continued to target Ms. Clark and, upon information and belief, have repeatedly rendered Ms. Clark either no reference or, in some instances, a poor reference when potential

employers call regarding Plaintiff's time at Defendant LIU.  As a result of Defendant LIU's retaliatory actions and despite her herculean effort to find subsequent higher education executive work, Ms. Clark has been estopped from re-entering the workforce in academia.

## CLAIMS FOR RELIEF
## AS AND FOR THE FIRST CAUSE OF ACTION
*(Race Discrimination – Hostile Work Environment in violation of the New York State Human Rights Law, the New York City Human Rights Law, and 42 U.S.C. § 1981)*

107.   Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

108.   Plaintiff is an African-American female, and is therefore a member of a protected class.

109.   Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at Defendant.

110.   Defendants subjected Plaintiff to a hostile work environment and an atmosphere of adverse employment actions and decisions that culminated in Plaintiff's constructive discharge, because of her race.

111.   Defendant Cline directly participated in, aided, and abetted the discrimination against Plaintiff.

112.   The race discrimination that Plaintiff suffered while employed at Defendant was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

113.   By reason of Defendant's violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

114.   As a further direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish,

outrage, severe anxiety about her future and her ability to support herself and her family, harm to

her employability and earning capacity, painful embarrassment among her family, friends, and

co-workers, damage to her good reputation, disruption of her personal life, marital discord, and

the loss of enjoyment of the ordinary pleasures of everyday life.

115.    Plaintiff was discriminated against and subjected to discrimination that created a

hostile work environment by Defendant based on her race, in violation of the New York State

and New York City Human Rights Law. As a result of Defendant's violation of the New York

State and New York City Human Rights Law, Plaintiff has been damaged in the sum to be

determined at trial but in no event less than $1,500,000.

## AS AND FOR THE SECOND CAUSE OF ACTION
*(Race Discrimination – Disparate Treatment in violation of the New York State Human*
*Rights Law, the New York City Human Rights Law, and 42 U.S.C. § 1981)*

116.    Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

117.    Plaintiff is an African-American female, and is therefore a member of a protected

class.

118.    Plaintiff was qualified to work as an employee for Defendant and she

satisfactorily performed the duties required by the position she held at Defendant.

119.    Plaintiff was illegally discriminated against when she suffered disparate treatment

at Defendants because she is African-American.

120.    As set forth in detail above and herein, Defendant subjected Plaintiff to disparate

treatment and disparate discipline on the basis of her race.

121.    Defendant Cline directly participated in, aided, and abetted the discrimination

against Plaintiff.

122.    The discrimination that Plaintiff suffered while employed at Defendant severely

affected the terms and conditions of her employment.

123.     By reason of Defendant's violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

124.     As a further direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

125.     Plaintiff was discriminated against and subjected to race discrimination by virtue of having been treated less well than her similarly situated colleagues outside her protected classes, having been demoted by Defendant based on her race, and having been unlawfully and unjustifiably constructively discharged in violation of the New York State Human Rights Law (N.Y. Exec. Law §§ 290 et. seq.) and the New York City Human Rights Law. As a result of Defendant's violation of the New York State and New York City Human Rights Law, Plaintiff has been damaged in the sum to be determined at trial but in no event less than $1,500,000.

## AS AND FOR THE THIRD CAUSE OF ACTION
*(Age Discrimination – Disparate Treatment in Violation of the New York City Human Rights Law and the New York State Human Rights Law)*

126.     Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

127.     Plaintiff is over 40 years old and therefore a member of a protected class.

128.     Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at Defendant.

129.    As demonstrated above, Defendant has engaged in a pattern and practice of targeting older faculty members on the basis of their age, and replacing older faculty members with less qualified, younger employees.

130.    As set forth in detail above and herein, Defendant subjected Plaintiff to disparate treatment and disparate discipline on the basis of her age.

131.    Defendant Cline directly participated in, aided, and abetted the discrimination against Plaintiff.

132.    The discrimination that Plaintiff suffered while employed at Defendant severely affected the terms and conditions of her employment. By way of example, as demonstrated above, Plaintiff was subjected to condescending and degrading comments, afforded less lucrative opportunities, repeatedly demoted without basis or justification, and ultimately constructively discharged.

133.    By reason of Defendant's violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

134.    As a further direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

135.    Plaintiff was discriminated against based on her age, in violation of the New York State and New York City Human Rights Law. As a result of Defendant's violation of Plaintiff's

statutory rights, Plaintiff has been damaged in the sum to be determined at trial but in no event less than $1,500,000.

## AS AND FOR THE FOURTH CAUSE OF ACTION
*(Disability Discrimination – Hostile Work Environment in violation of the New York State Human Rights Law and the New York City Human Rights Law)*

136.    Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

137.    Defendants subjected Plaintiff to a hostile work environment and an atmosphere of adverse employment actions and decisions that culminated in Plaintiff's constructive discharge, on the basis of her disability, which hostility and discrimination escalated after Plaintiff returned from her medical leave.

138.    The disability discrimination that Plaintiff suffered while employed at Defendant was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

139.    Defendant Cline directly participated in, aided, and abetted the discrimination against Plaintiff.

140.    By reason of Defendants' violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

141.    As a further direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

142.    Plaintiff was discriminated against and subjected to discrimination that created a hostile work environment by Defendant based on her disability, in violation of the New York State and New York City Human Rights Law. As a result of Defendant's violation of the New York State and New York City Human Rights Law, Plaintiff has been damaged in the sum to be determined at trial but in no event less than $1,500,000.


## AS AND FOR THE FIFTH CAUSE OF ACTION
*(Age Discrimination – Hostile Work Environmnet in Violation of the New York State Human Rights Law and the New York City Human Rights Law)*

143.    Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

144.    As demonstrated herein and above, Defendants instituted a policy, practice, and custom of terminating or forcing into retirement older employees in favor of younger, less qualified, and less experienced employees.

145.    Defendant subjected Plaintiff to a hostile work environment and an atmosphere of adverse employment actions and decisions that culminated in Plaintiff's constructive discharge, on the basis of her age.

146.    Defendant Cline directly participated in, aided, and abetted the discrimination against Plaintiff.

147.    The age discrimination that Plaintiff suffered while employed at Defendant was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

148.    By reason of Defendants' violations of Plaintiff's rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

149.    As a further direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered physical manifestations of stress, extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, marital discord, and the loss of enjoyment of the ordinary pleasures of everyday life.

150.    Plaintiff was discriminated against and subjected to discrimination that created a hostile work environment by Defendant based on her age, in violation of the New York State and New York City Human Rights Law. As a result of Defendant's violation of the New York State and New York City Human Rights Law, Plaintiff has been damaged in the sum to be determined at trial but in no event less than $1,500,000.

## AS AND FOR THE SIXTH CAUSE OF ACTION
*(Retaliation in violation of the New York State Human Rights Law, the New York City Human Rights Law, and 42 U.S.C. 1981)*

151.    Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

152.    As set forth in detail above, Defendant subjected Plaintiff to a hostile work environment, disparate treatment, and an atmosphere of adverse employment actions and decisions because of her race, age, and disability in violation of Plaintiff's statutory and constitutional rights.

153.    Plaintiff complained to Defendant regarding the rampant discrimination and hostile work environment she was subjected to during her employment with Defendant.

154.    Defendant repeatedly ignored Plaintiff's complaints and failed to carry out any thorough investigation into the merits of Plaintiff's report of discrimination and a hostile work environment.

155.    Defendant, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of discrimination and a hostile work environment, which retaliation culminated in Plaintiff's constructive discharge.

156.    Defendant Cline directly participated in, aided, and abetted the retaliation against Plaintiff.

157.    The retaliation substantially interfered with the terms and conditions of Plaintiff's employment.

158.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to: wages, social security, and other benefits due to her.

159.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

160.    Based on the foregoing, Defendant retaliated against Plaintiff for her lawful complaints of discrimination in violation of the Section 1981, the New York State and New York City Human Rights Law. As a result of the foregoing, Plaintiff has been damaged in an amount to be determined at trial but in no event less than $1,500,000.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

(i)      On the First Cause of Action, awarding Plaintiff compensatory and other damages including punitive damages in an amount to be determined at trial;

(ii)      On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages including punitive damages in an amount to be determined at trial;

(iii)      On the Third Cause of Action, awarding Plaintiff compensatory damages and other damages including punitive damages in an amount to be determined at trial;

(iv) On the Fourth Cause of Action, awarding Plaintiff compensatory damages and other damages including punitive damages in an amount to be determined at trial;

(v) On the Fifth Cause of Action, awarding Plaintiff compensatory damages and other damages including punitive damages in an amount to be determined at trial;

(vi) On the Sixth Cause of Action, awarding Plaintiff compensatory damages and other damages including punitive damages in an amount to be determined at trial;

(vii)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

**Further,** Plaintiff demands a trial by jury.

Dated:      **New York, New York**
               **March 21, 2017**

                                                    **NESENOFF & MILTENBERG, LLP.**
                                                    *Attorneys for Plaintiff*
                                                    **363 Seventh Avenue, Fifth Floor**
                                                    **New York, New York 10001**
                                                    **(212) 736-4500**

                                                    */s/ Megan Goddard*
                                                    **MEGAN GODDARD, ESQ.**
                                                    **GABRIELLE M. VINCI, ESQ.**

## VERIFICATION

**STATE OF** _New York_ )
                       ) ss.:
**COUNTY OF** _New York_ )

     **KIM CLARK,** being duly sworn, deposes and says:

     I am the Plaintiff named in this matter. I have read the annexed Verified Complaint, know the contents thereof, and the same are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

                                          **KIM CLARK**

Sworn to and subscribed before me
this 16th day of _March_ , 2017.

**NOTARY PUBLIC**

JULISA MARTINEZ
Notary Public, State of New York
No. 01MA6266927
Qualified in Queens County
Commission Expires August 6, 2020